**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: ) | |
| ) | |
| DEAN LEE BURDEN and ) | |
| DARLA KAY BURDEN, ) | Case No. 07-50366 |
| ) | |
| Debtors. ) | |

**AMENDED MEMORANDUM OPINION**[1]

Bankruptcy courts around the country are sharply divided over the issue before the Court in this Chapter 7 bankruptcy case. That issue is: May a debtor claim a deduction on the Bankruptcy Code's "means test" for payments on debts secured by collateral that the debtor intends to surrender to the creditor?

The majority of courts deciding this issue has held that the language of 11 U.S.C. § 707(b)(2)(A)(iii)(I) permits such a deduction, notwithstanding the reality that a debtor will likely have enough income to trigger the Bankruptcy Code's "presumption of abuse" in § 707(b)(2) when the debtor stops making payments on the debt secured by the surrendered collateral. The courts in the minority have held to the contrary, finding that such deductions cannot be permitted when §§ 707(b)(2)(A)(iii)(I) is properly read in context.

Upon careful consideration of the statute in context and an examination of the rationale cited by each side in this debate, this Court has come to the conclusion that the counterintuitive result reached by the majority of courts is not supported by the plain language of the Bankruptcy Code and is not in keeping with the intent of Congress when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005.

**BACKGROUND** [2]

*Procedural History*

On June 23, 2007, the Debtors, Dean Lee Burden and Darla Kay Burden, filed a voluntary

---

[1] Clerical amendments only; the substance remains unchanged.

[2] The Court has jurisdiction of this matter under 28 U.S.C. §§ 157(a) and 1334(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

petition under Chapter 7 of the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). On June 24, 2007, the Clerk of the Court scheduled the meeting of creditors required under 11 U.S.C. § 341 ("§ 341 Meeting") for August 3, 2007, in St. Joseph, Missouri. On June 25, 2007, however, the Clerk of the Court rescheduled the § 341 Meeting for July 20, 2007, in Kansas City, Missouri because the Debtors had erroneously selected St. Joseph, Missouri as the division for the case; the proper division is Kansas City, Missouri. The § 341 Meeting was convened on July 20, 2007, and concluded on July 27, 2007.

On August 2, 2007, the United States Trustee ("UST") filed the notice required by § 707(b)(4), reflecting her determination that the Debtors' case under Chapter 7 was presumptively abusive pursuant to § 707(b). And on August 24, 2007, the Trustee filed a motion to dismiss. The UST amended that motion on September 25, 2007, to add the allegation that this case should also be dismissed under 11 U.S.C. § 707(b)(3).

*Material Facts*

On the petition date, the Debtors filed, *inter alia*, a Petition, a Statement of Current Monthly Income and Means Test Calculation ("Form B22A"), Schedules, and a "Chapter 7 Statement of Intention" ("Statement of Intention"). Based on those filings, confirmed by the stipulation of facts submitted by the parties, the Court considers the following facts:

The Debtors are married and have two dependents. The Debtors' current monthly income ("CMI"), as defined by 11 U.S.C. 101(10A), is $12,604.71. This income exceeds the median monthly income for a family of four in Missouri by $7,331.88.[3]

The Debtors own a residence located at 8819 NE 92nd Terrace, Kansas City, Missouri ("Residence"). HSBC Card Services ("HSBC") holds a deed of trust on the Residence. As of the petition date, the Debtors owed HSBC $434,933.10 under the deed of trust.[4] The contractual payments on the deed of trust, including taxes and insurance, are $4,225 a month, but the Debtors have not made any payments to HSBC since the filing of the case. On their Statement of Intention,

---

[3] The median monthly income for a family of four in Missouri is $5,272.83 ($63,274 annually).

[4] The deed of trust most likely secures a promissory note which sets forth the terms of payment. However, the stipulation of facts submitted by the parties makes no mention of a promissory note, so the Court will refer to the deed of trust as the instrument under which the debt obligation arises.

2

the Debtors indicated that they intend to surrender the Residence to HSBC, but they had not done so as of the hearing on the UST's motion to dismiss held on November 6, 2007.[5]

At the time of the filing of this case, the Debtors also possessed a 2004 Ford F-150 Super Crew 4 x 4 truck. Ford Motor Credit held a purchase money security interest in this vehicle. On the petition date, the Debtors owed Ford Motor Credit $25,872.66, and the monthly payment on this obligation was $431.20. The Debtors have not made a monthly payment on this obligation since April 2007. The Debtors indicated on their Statement of Intention that they intended to surrender this vehicle, and, in fact, they did so on August 28, 2007.

On Form B22A, the Debtors checked the box indicating that the presumption of abuse does not arise in this case. According to the Debtors' calculations, which include deductions for payments on the two assets the Debtors intend to surrender – their Residence and the Ford truck – they have no disposable income.[6] The Debtors concede, however, that if they are not permitted to claim these deductions, they will have at least $3,222.35 of disposable income, which would be sufficient to trigger the presumption of abuse under 11 U.S.C. § 707(b)(2),[7] and their case would have to be dismissed or voluntarily converted to a case under Chapter 13 of the Bankruptcy Code.

## ANALYSIS

I.    *Timeliness of the UST's § 707(b)(3) Challenge.*

As a preliminary matter, the Court disposes of the Debtors' contention that the UST cannot seek dismissal of the Debtors' case under § 707(b)(3) because that allegation was not made within 60 days of the date first set for the meeting of creditors, as required by Fed. R. Bank. P. 1017(e)(1).

---

[5] Subsequent to the hearing, on December 6, 2007, the Debtors consented to a motion for relief from the stay filed by HSBC on November 30, 2007.

[6] According to the Debtors' calculations, their monthly disposable income is actually *negative* $722.85.

[7] The Court calculates the Debtors' disposable income by reducing the Debtors' total § 707(b)(2) deductions listed on line 48 of Form B22A by the amount of the payments on the Residence and truck ($4,656.20) less the $711 housing allowance the Debtors would be entitled to once the secured debt payment for the residence is disallowed. The UST also contends that the Debtor is not entitled to claim a deduction for the ownership expenses of the vehicle that has been surrendered. Because the Court's decision to disallow deductions for payments on the debts secured by the residence and truck is dispositive on the issue of abuse, the Court does not need to determine whether surrender of a vehicle also disqualifies a debtor from claiming an ownership expense for it, although the Court would be inclined to deny that deduction as well, based on the reasoning set forth in this memorandum opinion.

According to the official docket sheet in this case, the first date set for the meeting of creditors was August 3, 2007. Therefore, the UST had until October 2, 2007, to file a motion to dismiss based on § 707(b)(3). The UST amended its motion to dismiss to include § 707(b)(3) as a basis for dismissal on September 25, 2007; ergo, the UST's § 707(b)(3) allegation was timely. The fact that the § 341 meeting had to be rescheduled because the Debtors chose the wrong division when they filed the case is not only irrelevant, but the argument that they should receive some sort of tactical advantage as a result of their own mistake is not well taken. As a general rule, parties are entitled to rely on the notices and deadlines announced by the clerk of the court, even if they contain errors,[8] and the Debtors have not given the Court any reason to depart from that general rule.

Ultimately, however, the timeliness of the portion of the UST's motion to dismiss based on § 707(b)(3) is of no consequence because the Court has determined that the presumption of abuse arises under § 707(b)(2).

II.     *Deductions for Payments on Secured Debts under § 707(b)(2)(A)(iii)(I)*

Turning to the central issue, the Court briefly reviews the background of and framework within which means test "deductions" occur.

One of the main abuses of the bankruptcy system Congress sought to curtail by implementation of BAPCPA was the use of Chapter 7 to obtain a full discharge of unsecured debts by debtors who have sufficient income to repay all or a portion of their unsecured debt in a Chapter 13.[9] Preventing this kind of abuse is not a new concept, but Congress apparently believed that the existing procedure for determining whether a debtor was abusing Chapter 7 was inadequate.

---

[8] *See In re Moss*, 258 B.R. 391, 398 (Bankr. W.D. Mo. 2001) (citing, *inter alia*, *Nicholson v. Isaacman* (*In re Isaacman*), 26 F.3d 629, 631-32 (6th Cir.1994) (bankruptcy court clerk gave erroneous information about filing deadline); *Themy v. Yu* (*In re Themy*), 6 F.3d 688, 689 (10th Cir.1993) (notice sent by bankruptcy court resetting date for meeting of creditors erroneously re-set filing deadline)).

[9] "The Bankruptcy Reform Act of 2005 asks the very fundamental question of whether repayment is possible by an individual. It is this simple: If repayment is possible, then he or she will be channeled into chapter 13 of the Bankruptcy Code which requires people to repay a portion of their debt as a precondition for limited debt cancellation. . . .This bill does this by providing for a means-tested way of steering people . . . who can repay a portion of their debts, away from chapter 7 bankruptcy. . . ." 151 Cong. Rec. S1856 (Statement of Senator Charles Grassley, March 1, 2005). *See also*, *In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) ("Among the abuses identified by Congress was the easy access to chapter 7 liquidation proceedings by consumer debtors, who if required to file under chapter 13, could afford to pay some dividend to their unsecured creditors.").

Under pre-BAPCPA § 707(b), which provided for dismissal of a Chapter 7 bankruptcy case where "granting relief would be a substantial abuse of the provisions of this chapter," courts were given relatively broad judicial discretion in determining whether a case should be dismissed.[10] In this jurisdiction, the primary factor used to determine whether there was a substantial abuse of the Bankruptcy Code was the debtor's ability to repay debts out of future disposable income.[11] In practical terms, courts constructed a hypothetical Chapter 13 plan based on the debtor's actual income and expenses. If it appeared that the debtor could make a "substantial effort" in repaying his debts, the court would find substantial abuse and the case would be converted or dismissed.

Congress retained the basic contours of this approach in amended § 707(b)(3), which directs courts to consider the "totality of the circumstances" in determining whether the granting of relief would be an "abuse" of the provisions of Chapter 7.[12] The circumstances considered under amended § 707(b)(3) include an evaluation of a debtor's ability to repay creditors based on the debtors' actual income and expenses.[13]

The "means test" of § 707(b)(2) also determines abuse by measuring a debtor's ability to fund a hypothetical Chapter 13, but the discretion of the court has been largely limited to the application of a mechanical formula which calculates disposable income by deducting a list of permitted expenses, most of which are determined by reference to standard expenses promulgated by the Internal Revenue Service for use in its debt collection efforts, from a figure (ironically called "current monthly income" ) calculated by averaging the debtor's income for the six months prior to the petition date.

Although most of the expenses in the means test are standardized, § 707(b)(2)(A)(iii) provides a deduction based on a debtor's *actual* payments on secured debts. This deduction is calculated (in traditional, Congressionally pellucid fashion) as the sum of the average of:

---

[10] *See In re Nelson*, 223 B.R. 349, 351 (B.A.P. 8th Cir. 1998).

[11] *See In re Walton*, 866 F.2d 981, 985 (8th Cir.1989).

[12] 11 U.S.C. § 707(b)(3).

[13] *See, e.g., In re Freis*, 2007 WL 1577752, *2 (Bankr. W.D. Mo. 2007); *In re Henebury*, 361 B.R. 595 (Bankr. S.D. Fla. 2007). *See also, Wedoff, Means Testing in the New § 707(b)*, 79 Am. Bankr. L.J., 231, 235 (2005).

5

> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.[14]

The Debtors have taken the position that this provision entitles them to deduct the payments on the debts secured by their Residence and the truck, notwithstanding the fact that they filed a Statement of Intention indicating their intent to surrender both of these assets to the respective creditors, and as of the date of the hearing on this matter, had already surrendered the truck. The UST, on the other hand, argues that the Debtors cannot deduct payments on debts secured by property they intend to surrender.

As alluded to above, both sides of this dispute have case law on their side. But the numbers are far from even. The vast majority of courts considering this issue have determined that §707(b)(2)(A)(iii)(I) permits a debtor to claim a deduction for payments on debts secured by property that the debtor intends to surrender.[15]

The majority position boils down to two essential points – that amounts "scheduled as contractually due" in § 707(b)(2)(A)(iii)(I) refers to the amounts due as "provided for by" the underlying contract,[16] and that the means test calculations are intended to represent a "snapshot" as of the petition date, examined without regard to a debtor's future intentions. Because an intent to surrender has no legal effect on a debt, the majority reasons, a debtor is obligated on the petition date to make the contractual payments to the creditor, and therefore may claim a means-test deduction

---

[14] 11 U.S.C. § 707(b)(2)(A)(iii)(I) and (II).

[15] *See, e.g., In re Burmeister,* 2007 WL 4052368 (Bankr. N.D. Ill. 2007); *In re Chang*, 2007 WL 3034679 (Bankr. N.D. Cal. 2007); *In re Hayes*, 2007 WL 2815983 (Bankr. D. Mass. 2007); *In re Kelvie*, 372 B.R. 56 Bankr. D. Idaho 2007); *In re Wilkins*, 370 B.R. 815 (Bankr. CD. Cal 2007); *In re Koaler*, 368 B.R. 785 (Bankr. W.D. Wis. 2007); *In re Longo*, 364 B.R. 161 (Bankr. D. Conn. 2007); *In re Mundy*, 363 B.R. 407 (Bankr. M.D. Pa. 2007); *In re Sorrell*, 359 B.R. 167 (Bankr. S.D. Ohio 2007); *In re Hartwick*, 359 B.R. 16 (Bankr. D. N.H. 2007); *In re Randle*, 358 B.R. 360 (Bankr. N.D. Ill. 2006), aff'd, 2007 WL 2668727 (N.D. Ill. 2007); *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006); *In re Walker*, 2006 WL 1314125 (Bankr. N.D. Ga. 2006).

[16] *See Longo*, 364 B.R. at 165-166; *Mundy* 363 B.R. 411-413; *Randle*, 358 B.R. at 364-65; *In re Sorrell*, 359 B.R. at 184-85.

for those payments.[17] Many courts in the majority have acknowledged that this result may be inconsistent with the reality of the situation, but they assert that it is mandated by the plain language of the statute[18] and is consistent with Congress's intent to create in § 707(b)(2) a standardized and mechanical test that "avoid[s] reliance on individualized information as much as possible. . . ."[19]

The courts in the minority on this issue also focus on the plain language of the statute, but they assert that the term "scheduled" in § 707(b)(2)(A)(iii)(I) has a bankruptcy-specific meaning which refers to how the debt is listed in a debtor's schedules and statements.[20] Thus, if the debtor has indicated an intent to surrender the debt on his Statement of Intention, then the debt is not "scheduled as contractually due," and the debtor cannot deduct the payment on that debt on the means test. The minority asserts that its approach better effectuates BAPCPA's goal of ensuring that those debtors who can pay their debts do so.[21]

Not cowed by the numbers, this Court pitches its tent in the minority camp. In addition to having what this Court believes is the stronger linguistic argument, the minority's interpretation of § 707(b)(2)(A)(iii)(I) better squares with its conjunctively joined neighbor § 707(b)(2)(A)(iii)(II), and advances two of BAPCPA's goals. Moreover, the Court is not persuaded by the arguments leveled against the minority's interpretation of § 707(b)(2)(A)(iii)(I).

With regard to the minority's linguistic analysis of § 707(b)(2)(A)(iii)(I), particularly persuasive is the *In re Ray* court's observation that the majority's interpretation of "scheduled" to mean "provided for by" renders "scheduled" without real meaning. "A problem with [the majority]

---

[17] A third approach, adopted in only one case, ironically captioned *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006), puts a slightly different spin on the majority approach, holding that a debtor's stated intention to surrender does not eliminate the right to deduct a secured debt payment on the means test, but that the actual surrender of the collateral does if it is done by the date of the hearing. *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006).

[18] *See, e.g.*, *In re Koaler*, 368 B.R. at 789; *In re Walker*, 2006 WL 1314125 at *6.

[19] *In re Randle*, 358 B.R. at 364.

[20] *See In re Ray*, 362 B.R. 680 (Bankr. D. S.C. 2007); *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006); *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo.2006). *See also*, *In re Spurgeon*, 2007 WL 2984180 (Bankr. E.D. Tenn. 2007) (holding that a Chapter 13 debtor may not claim a deduction from his disposable income for payments on debts secured by property to be surrendered); *In re Love*, 350 B.R. 611 (Bankr. M.D. Ala.2006) (same).

[21] *See In re Ray*, 362 B.R. at 684; *In re Skaggs*, 349 B.R. at 600; *In re Harris*, 353 B.R. at 309.

cases is that they come to the same conclusion about the meaning of the statute as would result if the words 'scheduled as' were not present but do so by focusing on those very words."[22] In contrast, imbuing "scheduled" with a bankruptcy-specific meaning respects the canon of statutory interpretation that a statute "must, if possible, be construed in such a fashion that every word has some operative effect."[23] And, contrary to some of the voices in the majority, the Court does not believe it is an interpretive "stretch,"[24] or a "grammatical exercise too complex and strenuous to be considered 'plain'"[25] to interpret "scheduled" as a reference to a debtor's Statement of Intention.

As the *Skaggs* court astutely noted, "statutory construction is a holistic endeavor."[26] "In interpreting one part of a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."[27] The Court finds the direction it needs on this issue by looking no further than § 707(b)(2)(A)(iii)(II).

Section 707(b)(2)(A)(iii)(II) provides that the calculation of a debtor's secured debt payment expense includes "any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts."[28] Aside from the immediate implication that the statute, by its plain terms, contemplates an evaluation of a debtor's intention to maintain the possession of certain property – thereby countering the majority's contention that consideration of a debtor's statement of intention is a stretch – § 707(b)(2)(A)(iii)(II) has at least two other implications for the interpretation of § 707(b)(2)(A)(iii)(I), notwithstanding the fact that it applies specifically to Chapter 13 debtors.

---

[22]*In re Ray*, 362 B.R. at 683.

[23] *United States v. Nordic Village., Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

[24] *In re Kogler*, 368 B.R. at 790.

[25] *In re Mundy*, 363 B.R. at 412.

[26] *In re Skaggs*, 349 B.R. at 599 (quoting *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004)).

[27] *Id.*(quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975)).

[28] 11 U.S.C. § 707(b)(2)(A)(iii)(II).

First, permitting deductions for payments on debts secured by collateral that a debtor intends to surrender produces absurd results when § 707(b)(2)(A)(iii)(II) comes into play.  One, it would be absurd to permit a Chapter 13 debtor who indicates his intent to surrender his residence to claim a deduction for his regular mortgage payments but to deny him, under §707(b)(2)(A)(iii)(II), a deduction for any pre-petition arrearage.  If the debtor cannot claim a deduction for the arrearage, he should not be entitled to claim a deduction for the regular payment.  And two, disallowing a debtor's deduction for "additional" payments on his "primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents" because he intends to surrender it (them) but permitting the debtor to deduct payments on other debts secured by property to be surrendered would also be absurd.

Admittedly, these absurdities arise in the context of the determination of an above median-income Chapter 13 debtor's disposable income under 11 U.S.C. § 1325(b)(3), but § 1325(b)(3) incorporates § 707(b)(2)(A) and (B) without qualification, and it would be illogical to have one interpretation of § 707(b)(2)(A)(iii)(I) for Chapter 7 and a different interpretation for Chapter 13. The interpretations between chapters must be consistent, and the only interpretation that makes sense in the context of both Chapter 13 and Chapter 7 is that § 707(b)(2)(A)(iii)(I) applies only to payments on debts secured by property that a debtor intends to keep.

The second implication of § 707(b)(2)(A)(iii)(II) flows from the statute's use of the word "additional," which connotes a connection or commonality between the payments referred to in subsection I and subsection II.  In parsing the short text of the statute to determine the source of that commonality, it is apparent that the only possible connection between §707(b)(2)(A)(iii)(I) and (II) is the requirement that the payments to secured creditors be "necessary . . . to maintain possession of the property"; the other clauses, relating to filing a plan under chapter 13 and to specific property, would be non-sequiturs linked to § 707(b)(2)(A)(iii)(I).  In other words, the payments which 707(b)(2)(A)(iii)(II) "adds" will never be "in a plan under chapter 13," when § 707(b)(2)(A)(iii)(I) is being applied to a Chapter 7 debtor; and the deduction claimed by a Chapter 7 debtor will not necessarily always be for payments on a debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents because 707(b)(2)(A)(iii)(I) doesn't contain that limitation.

Thus, an examination of § 707(b)(2)(A)(iii)(I) in the context in which it appears – namely, as the conjunctive partner of § 707(b)(2)(A)(iii)(II) – reinforces the conclusion that § 707(b)(2)(A)(iii)(I) applies only to payments on debts secured by collateral that a debtor intends to keep.

III. *Taking a Snapshot of a Debtor's Intentions*

On a final note, the Court addresses the argument often invoked against the minority position that its reliance on a debtor's statement of intention is inconsistent with Congress's intention that the means test be a "snapshot" of a debtor's financial condition as of the petition date – mechanical, and unaffected by future events or what "debtors say they plan to do when they file bankruptcy."[29]

First, the Court has no problem binding debtors to what they say they plan to do when they file bankruptcy. Debtors are bound by what they say in schedules all the time. Why should a debtor's statement of intention be any different? If a debtor indicates that he intends to surrender property, his financial condition will be judged at the time of that statement, which, more often than not, is the petition date.

Second, there are statutory mechanisms ensuring that the statement and performance of a debtor's intentions with regard to secured property occur promptly enough to be captured in a "snapshot." Specifically, 11 U.S.C. § 521(a)(2)(A) requires that a debtor file a statement of intention, if the schedules include debts that are secured by property of the estate, within 30 days of the petition date or before the meeting of creditors, whichever is earlier, and the debtor must then perform that intention within 30 days of the first date set for the meeting of creditors.[30] These dates may be subject to extension by the court, but the pressure to perform the intention is still real and immediate, since the automatic stay terminates and personal property is no longer property of the estate if the debtor fails to timely file the statement or take the action specified in the statement.[31]

> These limitations on a debtor's ability to deal with secured property, although subject to some extension by the court and to some rights by the trustee, do not open the

---

[29] *In re Kogler*, 368 B.R. at 789-90. *See also*, *Hartwick*, 352 B.R. at 870.

[30] 11 U.S.C. § 521(a)(2)(B).

[31] 11 U.S.C. § 362(h).

door to unending equivocation on the part of the debtor. Rather, these provisions, added to the Code by amendment in 1984 and 2005, impose a duty to act promptly. Indeed, gamesmanship with the statement of intention could well impact the dismissal analysis under § 707(b)(3) and certainly is not a sound basis for grounding an interpretation of the secured debt payment deduction in the means test.[32]

Third, the Court disputes the characterization that the minority position is dependent on a debtor's future conduct. The minority position relies no more on future conduct than the majority position does. Quite simply, whether a debtor may claim a deduction under § 707(b)(2)(A)(iii)(I) is determined on the date a debtor files his Statement of Intention. Subsequent events are irrelevant – to the application of the statute and to the outcome. If a debtor states his intention to surrender property (and thereby forgoes a deduction for payments on the debt secured by that property) but ultimately fails to carry out that intention, the secured creditor will most likely foreclose on its security interest and repossess the property. So, in the end, the debtor will be in the same position, *i.e.*, have the same disposable income, he would have had if he had carried out his stated intention. Conversely, if he takes a deduction for payments on a debt secured by collateral he intends to keep, but later decides to surrender that property (or fails to make the payments on that debt and the property is repossessed), the debtor may (in theory) have additional disposable income. But this result is no different, or "worse" if you will, than permitting a debtor to claim a deduction for payments on a debt he has affirmatively stated he intends to surrender.

## CONCLUSION

Despite the general agreement among courts that permitting debtors to deduct payments on debts secured by property they intend to surrender may be inimical to BAPCPA's goal of requiring debtors who have the ability to repay creditors to do so, a majority of courts interpreting § 707(b)(2)(A)(iii)(I) have determined that the plain language of the statute mandates that result, and have justified this interpretation of the statute on the basis that it is consistent with Congress's narrower goal of creating a mechanical test in § 707(b)(2) that doesn't get bogged down in considerations of a debtor's actual circumstances or intentions. After due consideration of the language and context of § 707(b)(2)(A)(iii)(I), the Court believes this trade-off is unnecessary.

---

[32] *In re Ray*, 362 B.R. at 685.

11

Not only does the plain language of § 707(b)(2)(A)(iii)(I) support the denial of a means-test deduction for payments secured by property a debtor intends to surrender, this interpretation creates no statutory surplusage, is consistent with the other subsection of § 707(b)(2)(A)(iii), advances Congress's primary goal of preventing debtors who can afford to pay their creditors from obtaining a full discharge in Chapter 7, <u>and</u> does this in a manner consistent with the means test's mechanical approach.

Therefore, for the reasons stated above, the Court finds that Debtors may not claim a deduction under § 707(b)(2)(A)(iii)(I) for payments on debt secured by the property they intend to surrender, namely, their Residence and a Ford truck. Consequently, the Debtors are deemed to have at least $3,222.35 of disposable income, which is sufficient to trigger the presumption of abuse under 11 U.S.C. § 707(b)(2). The Court will delay the effective date of its Order for 10 days to allow the Debtors time to file a motion to convert this case to Chapter 13. If no such motion is filed, the case will be dismissed.

A separate order consistent with this Memorandum Opinion will be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 20th day of December 2007.

       /s/   Jerry W. Venters
United States Bankruptcy Judge

A copy of the foregoing mailed electronically or
conventionally to:
United States Trustee
Edward A. Coulson